## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**Holding a Criminal Term**
**Grand Jury Sworn in on November 9, 2023.**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | **CRIMINAL NO.** |
| | : | **Grand Jury Original** |
| v. | : | |
| | : | **VIOLATIONS:** |
| OMOLERE OMOMOWO, | : | |
| (Counts 1-15) | : | **Count 1:** 18 U.S.C. § 1349 |
| | : | **(Conspiracy to Commit Health** |
| ZILAH BESSEM, | : | **Care Fraud)** |
| (Counts 1, 2, 3) | : | |
| | : | **Counts 2-11:** 18 U.S.C. § 1347 |
| GREGORY CLARK, | : | **(Health Care Fraud)** |
| (Counts 1, 4, 5) | : | |
| | : | **Count 12-15:** 18 U.S.C. § 1957 |
| ERNEST IKOMI, | : | **(Engaging in Monetary** |
| (Counts 1, 6, 7) | : | **Transactions in Property Derived** |
| | : | **from Specified Unlawful Activity)** |
| DIANE MOCHE, and | : | |
| (Counts 1, 8, 9) | : | **Criminal Forfeiture:** 18 U.S.C. § |
| | : | **982(a)(1) & (7); 28 U.S.C. §** |
| SERAPHINE NWUFOR, | : | **2461(c), and 21 U.S.C. § 853(p)** |
| (Counts 1, 10, 11) | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

## <u>INDICTMENT</u>

The Grand Jury for the District of Columbia charges that, at times material to this

Indictment, on or about the dates and times stated herein:

## GENERAL ALLEGATIONS

1.    Beginning at least as early as January 2020 and continuing through at least March 2023, in the District of Columbia and elsewhere, Defendants OMOLERE OMOMOWO, ZILAH BESSEM, GREGORY CLARK, ERNEST IKOMI, DIANE MOCHE, and SERAPHINE NWUFOR, agreed and conspired together and with others to, and engaged in a scheme to, defraud the District of Columbia's Medicaid program, and did in fact defraud the District of Columbia's Medicaid Program, by engaging in a scheme to, among other things, submit bills for mental-health related services that were not medically necessary, not reimbursable, and did not occur.

### D.C. Medicaid and Behavioral Health Regulatory Framework

2.    Medicaid was a health insurance program established by Congress under Title XIX of the Social Security Act of 1965. In the District of Columbia (D.C.), Medicaid was jointly funded by the federal and D.C. governments. Medicaid provided health insurance coverage to D.C. residents whose incomes were below a certain financial threshold. Recipients of medical services covered by Medicaid were referred to as "beneficiaries." Medicaid was a "health care benefit program" as defined in 18 U.S.C. § 24(b) and a "Federal health care program" as defined in 42 U.S.C. § 1320a-7b(f).

3.    In D.C., behavioral health services were administered by the D.C. Department of Behavioral Health ("DBH"). As the primary mental health authority in D.C., DBH was responsible for implementing and overseeing D.C.'s Mental Health Rehabilitative Services ("MHRS") program, a program covered by Medicaid. MHRS were intended to assist eligible Medicaid beneficiaries with navigating and alleviate the impact of mental and behavioral health issues. Beneficiaries who received MHRS were often referred to as "consumers."

4.      Under the MHRS program, Medicaid covered and reimbursed standard behavioral health services, such as Community Support services. Community Support services included, among other things, assistance and support for mental-health consumers in stressor situations, individual mental health interventions, assistance with increasing social support skills to enable consumers to ameliorate life stresses, and the development of mental health relapse prevention strategies. Community Support services were provided by a consumer's Community Support Worker ("CSW") under the auspices of a certified Medicaid Provider known as a Core Services Agency ("Provider").

5.      Medicaid also provided reimbursement for certain types of specialty MHRS, including the Assertive Community Treatment ("ACT") program. According to DBH guidelines, the ACT program provided intensive, integrated services to adults with an "intractable, serious, and persistent mental illness," coupled with, for example, frequent acute psychiatric hospitalizations, substance abuse disorders, chronic homelessness, or prolonged residency in an inpatient setting. To assess candidates for inclusion in the ACT program, Providers were required to conduct a multi-axial diagnosis of the consumer's medical condition, a psychosocial summary, and a level of care utilization system ("LOCUS") assessment. Only consumers with a LOCUS score of 20-22 or higher during an initial assessment were eligible for ACT services. In order to exit or be "stepped down" from the ACT program, Providers were likewise required to conduct a LOCUS assessment to ensure the consumer no longer required the heightened level of care contemplated by the ACT program. Similarly, a consumer could not transfer to another Provider while receiving ACT services in order to ensure continuity of care for consumers with severe mental and behavioral health illnesses.

6.    In D.C., MHRS encounters with consumers were billed in "units," with one unit being equivalent to 15 minutes of time providing services to a consumer. Standard MHRS encounters, including Community Support services, were assigned billing code H0036 and reimbursed by Medicaid at a rate of $97.08 per hour. ACT services were billed under code H0039 and reimbursed by Medicaid at a rate of $185.75 per hour. DBH regulations required the actual start and stop time of MHRS encounters to be used to calculate the duration of the service. For purposes of reimbursement, Medicaid authorized service encounters exceeding seven minutes to be rounded up to the nearest whole unit.

7.    Because the ACT program was intended to provide intensive, wrap-around services to consumers with the most severe mental and behavioral health issues, Medicaid authorized Providers to submit reimbursable encounter notes more frequently for ACT consumers. Until November 2021, Medicaid authorized Providers to bill 200 units every 180 days for standard MHRS encounters. By contrast, Medicaid authorized Providers to bill 600 units every 180 days for ACT services. In November 2021, Medicaid increased the amount of units Providers were authorized to bill for MHRS encounters from 200 units to 600 units every 180 days. After 180 days or the depletion of 600 units, a Provider was allowed to submit an "authorization" or "reauthorization" request to DBH for additional units to continue services. Such requests were non-billable administrative tasks and did not qualify for Medicaid reimbursement.

8.    Providers were required to maintain up-to-date records and to accurately document all MHRS encounters by submitting a claim or encounter note in the Provider's electronic medical records ("EMR") system. In D.C., Providers typically used an EMR platform called Credible. In order to be reimbursed by Medicaid for MHRS provided to consumers, CSWs were required to document the service in Credible by inputting clinical encounter notes that included, among other

4

information, consumer information, services rendered, treatment notes, location of the service, and dates and times of service. Under Medicaid, only medically necessary services included in a consumer's treatment plan were authorized to be reimbursed.

9.    CSWs were authorized to conduct MHRS encounters in several ways, including in the office or in-person. In response to the COVID pandemic, in or about March 2020, DBH authorized Providers to conduct MHRS encounters by telehealth. A "telehealth" visit indicated a telephonic or virtual encounter with a consumer. CSWs were required to validate the accuracy and authenticity of the services by signing their names electronically in Credible. Once a CSW submitted an encounter note into Credible for reimbursement, licensed clinical staff were required to review the notes for accuracy and approval prior to submission to Medicaid for reimbursement.

10.    Providers, as well as all employees of Providers, including CSWs, were required to know, understand, and follow all federal and local laws, including Medicaid rules and regulations established by DBH.

### Relevant Entities and Individuals

11.    PRESTIGE HEALTHCARE RESOURCES ("PRESTIGE") was a Medicaid Provider headquartered at 1418 Good Hope Road SE in Washington, D.C. At all relevant times, PRESTIGE was authorized to provide MHRS to Medicaid beneficiaries in Washington, D.C. On February 25, 2020, PRESTIGE was approved by DBH to implement an ACT Program.

12.    AFFORDABLE HOME HEALTHCARE LLC ("AFFORDABLE") was a Medicaid Provider headquartered at 7826 Eastern Avenue NW, Unit 411, Washington, D.C. At all relevant times, AFFORDABLE was authorized to provide MHRS to Medicaid beneficiaries in Washington, D.C. AFFORDABLE was not authorized by DBH to provide ACT services to consumers.

13.     GOSHEN HEALTHCARE MANAGEMENT SERVICES LLC ("GOSHEN") was a corporation headquartered at 1715-1717 Newton Street NW, Washington, D.C. At all relevant times, GOSHEN was authorized to provide MHRS to Medicaid beneficiaries in Washington, D.C. GOSHEN was not authorized by DBH to provide ACT services to consumers.

14.     THE MARCAULAY GROUP INC. ("THE MARCAULAY GROUP") was a corporation headquartered at 4576 NW 16th Avenue in Tamarac, Florida. THE MARCAULAY GROUP was formed by OMOLERE OMOMOWO on April 6, 2021 and purported to provide billing and staffing services for Medicaid Providers based in Washington, D.C., including AFFORDABLE and GOSHEN.  THE MARCAULAY GROUP was never certified as a Provider or as a Sub-Provider with DBH. Per DBH and D.C. Medicaid regulations, only a certified Provider was permitted to provide clinical and behavioral health services to Medicaid recipients.

15.     Defendant OMOLERE OMOMOWO ("OMOMOWO") was a resident of Bowie, Maryland, and Fort Lauderdale, Florida. OMOMOWO became the CFO of PRESTIGE in 2019. In his role as CFO, OMOMOWO worked closely with CO-CONSPIRATOR 1 regarding billing for MHRS and the implementation of the ACT Program. As part of his duties, OMOMOWO submitted, or caused to be submitted, claims to Medicaid for reimbursement.

16.     Defendant ZILAH T. BESSEM ("BESSEM") was a resident of Laurel, Maryland and Frisco, Texas.  BESSEM worked as a CSW for PRESTIGE.  In April 2021, BESSEM was hired by THE MARCAULAY GROUP and contracted to work as a CSW at AFFORDABLE and later GOSHEN.  As part of her duties, BESSEM submitted, or caused to be submitted, claims to Medicaid for reimbursement.

17.     Defendant GREGORY O. CLARK ("CLARK") was a resident of Washington, D.C.  CLARK worked as a CSW for PRESTIGE.  In April 2021, CLARK was hired by THE

MARCAULAY GROUP and contracted to work as a CSW at AFFORDABLE and later GOSHEN. As part of his duties, CLARK submitted, or caused to be submitted, claims to Medicaid for reimbursement.

18.    Defendant ERNEST IKOMI ("IKOMI") was a resident of Beltsville, Maryland. IKOMI worked as a CSW and Care Coordinator for PRESTIGE. In April 2021, IKOMI was hired by THE MARCAULAY GROUP and contracted to work as a CSW and Care Coordinator at AFFORDABLE and later GOSHEN. As part of his duties, IKOMI submitted, or caused to be submitted, claims to Medicaid for reimbursement.

19.    Defendant DIANE MOCHE ("MOCHE") was a resident of Adelphi, Maryland. MOCHE worked as a CSW and Care Coordinator for PRESTIGE. In April 2021, MOCHE was hired by THE MARCAULAY GROUP and contracted to work as a CSW and Care Coordinator at AFFORDABLE and later GOSHEN. As part of her duties, MOCHE submitted, or caused to be submitted, claims to Medicaid for reimbursement.

20.    Defendant SERAPHINE NWUFOR ("NWUFOR") was a resident of Bowie, Maryland. NWUFOR worked as a CSW for PRESTIGE. In April 2021, NWUFOR was hired by THE MARCAULAY GROUP and contracted to work as a CSW at AFFORDABLE and later GOSHEN. As part of her duties, NWUFOR submitted, or caused to be submitted, claims to Medicaid for reimbursement.

21.    CO-CONSPIRATOR 1 was a resident of Baltimore, Maryland, and a Nurse Practitioner by education and training. In 2015, CO-CONSPIRATOR 1 was hired by PRESTIGE, and in or about February 2020, she was appointed to be the ACT Program Coordinator. In April 2021, CO-CONSPIRATOR 1 was hired by OMOMOWO to serve as the Medical Director for the CSWs working at THE MARCAULAY GROUP. Through THE MARCAULAY GROUP,

CO-CONSPIRATOR 1 also worked as a contractor at AFFORDABLE and later GOSHEN. As part of her duties, CO-CONSPIRATOR 1 submitted, or caused to be submitted, claims to Medicaid for reimbursement.

22.    By submitting encounter notes into Credible and to Medicaid for reimbursement, OMOMOWO and CO-CONSPIRATOR 1, along with BESSEM, CLARK, IKOMI, MOCHE, and NWUFOR (the "CSW CO-CONSPIRATORS"), were required to certify that services were medically necessary and had been performed as documented in the encounter notes.

### Fraud Involving ACT Program at PRESTIGE

23.    In the course of their employment, OMOMOWO and CO-CONSPIRATOR 1 exercised oversight over multiple CSWs, including the CSW CO-CONSPIRATORS. OMOMOWO and CO-CONSPIRATOR 1 worked together closely regarding training the CSW CO-CONSPIRATORS on billing standards promulgated by DBH, as well as documentation required by Medicaid. OMOMOWO and CO-CONSPIRATOR 1 likewise worked closely together to implement the ACT program at PRESTIGE.

24.    As a Nurse Practitioner, CO-CONSPIRATOR 1 submitted clinical encounter notes for services she allegedly performed on behalf of MHRS consumers. CO-CONSPIRATOR 1 also reviewed and approved encounter notes for MHRS services allegedly performed by CSWs working under her supervision. Once CO-CONSPIRATOR 1 approved the CSW notes in Credible, OMOMOWO batched the notes for submission to Medicaid for reimbursement.

25.    In February 2020, DBH authorized PRESTIGE to implement an ACT program. In his role as CFO of PRESTIGE, Defendant OMOMOWO was the primary architect of the implementation of the ACT program. CO-CONSPIRATOR 1, a Nurse Practitioner and licensed clinician, was promoted to be the ACT Program Coordinator. In order for a consumer to receive

ACT services, PRESTIGE, as the Medicaid Provider, was required to certify that the required assessments had been completed, including LOCUS scores, and that a consumer met the criteria to be eligible for ACT services.

26.    Working closely together with CO-CONSPIRATOR 1, OMOMOWO orchestrated a plan by which most, if not all, of the consumers on certain CSWs' caseloads were stepped up from receiving standard MHRS into receiving services as part of the ACT Program. OMOMOWO and CO-CONSPIRATOR 1 implemented the scheme by directing the submission of false and fraudulent LOCUS scores by clinical personnel at PRESTIGE in order to step consumers up into the ACT Program despite ACT services not being medically necessary for the consumers. The CSW CO-CONSPIRATORS knowingly and willingly participated in the scheme to include consumers in the ACT Program for whom ACT services were not medically necessary. By stepping up consumers with less severe mental and behavioral health issues into the ACT program, OMOMOWO, CO-CONSPIRATOR 1, and the CSW CO-CONSPIRATORS were able to bill Medicaid more frequently and at a significantly higher rate.

27.    Once the consumers had been approved by DBH to receive ACT services, OMOMOWO, CO-CONSPIRATOR 1, and the CSW CO-CONSPIRATORS submitted encounter notes for ACT services that had been allegedly performed on behalf of these consumers. Despite knowing that the ACT program had been utilized primarily to increase revenue and knowing that the consumers had been approved for the ACT program on the basis of false and fraudulent assessments, OMOMOWO, CO-CONSPIRATOR 1, and the CSW CO-CONSPIRATORS billed Medicaid, or caused Medicaid to be billed, for ACT services that were not medically necessary. Despite knowing that CO-CONSPIRATOR 1 and the CSW CO-CONSPIRATORS were

submitting fraudulent claims regarding ACT services to Medicaid, OMOMOWO batched the encounter notes and submitted the claims to Medicaid for reimbursement.

28.    In or about April 2021, following an employment dispute with the CEO of PRESTIGE, OMOMOWO resigned. At OMOMOWO's direction and encouragement, CO-CONSPIRATOR 1 and the CSW CO-CONSPIRATORS also resigned. In furtherance of the conspiracy, OMOMOWO created THE MARCAULAY GROUP, which hired CO-CONSPIRATOR 1 and the CSW CO-CONSPIRATORS who had left PRESTIGE to follow OMOMOWO.

29.    Following the exit from PRESTIGE, THE MARCAULAY GROUP—that is, OMOMOWO, CO-CONSPIRATOR 1, and the CSW CO-CONSPIRATORS—contracted with AFFORDABLE, and later GOSHEN, purportedly to provide "billing and staffing" services for those companies. In reality, THE MARCAULAY GROUP used AFFORDABLE and GOSHEN'S Medicaid Provider status to provide MHRS services directly to Medicaid consumers. AFFORDABLE, however, did not have an ACT Program, which meant that the consumers transferring out of PRESTIGE's ACT Program could not simply transfer to AFFORDABLE without having legally required medical assessments to determine whether any consumers continued to need ACT services.

30.    Working with CO-CONSPIRATOR 1, defendant OMOMOWO initiated a plan to step down almost all of the ACT consumers from the ACT program in order to transfer those consumers to AFFORDABLE. OMOMOWO and CO-CONSPIRATOR 1 directed the CSW CO-CONSPIRATORS to initiate the ACT step-down process without regard to medical necessity and without performing any of the required assessments. Similar to the mass step-up of these consumers into the ACT Program, OMOMOWO and CO-CONSPIRATOR 1 directed the

CSW CO-CONSPIRATORS to falsify encounter notes to reflect that their consumers were stable and no longer in need of ACT services.

## Submission of Fraudulent MHRS Claims to Medicaid

31. As noted, OMOMOWO, CO-CONSPIRATOR 1, and the CSW CO-CONSPIRATORS worked at PRESTIGE until approximately April 2021, at which point they transitioned to THE MARCAULAY GROUP. Thereafter, OMOMOWO, CO-CONSPIRATOR 1, and the CSW CO-CONSPIRATORS worked with AFFORDABLE, submitting MHRS bills using AFFORDABLE's Provider status until at least December 2022. Beginning in December 2022 and continuing to at least March 2023, OMOMOWO, CO-CONSPIRATOR 1, and the CSW CO-CONSPIRATORS ceased working with AFFORDABLE and began working with GOSHEN, where the same fraudulent billing and business practices continued.

32. At PRESTIGE, AFFORDABLE, and GOSHEN, beginning at least as early as January 2020, and continuing through at least March 2023, OMOMOWO, CO-CONSPIRATOR 1, and the CSW CO-CONSPIRATORS knowingly submitted or caused to be submitted false and fraudulent MHRS clinical encounter notes to Medicaid for reimbursement. Specifically, OMOMOWO, CO-CONSPIRATOR 1, and the CSW CO-CONSPIRATORS agreed and conspired to and did submit false and fraudulent MHRS encounter notes to Medicaid that (1) grossly inflated the amount of time spent conducting MHRS; (2) were based on services not authorized to be reimbursed by Medicaid; and (3) for MHRS encounters that did not occur.

33. As part of the conspiracy and fraud scheme, OMOMOWO and CO-CONSPIRATOR 1 instructed and trained the CSW CO-CONSPIRATORS to submit telehealth encounter notes that grossly inflated the amount of time the CSW CO-CONSPIRATORS spent

conducting services on behalf of a consumer. OMOMOWO and CO-CONSPIRATOR 1 trained the CSW CO-CONSPIRATORS that MHRS encounters should be billed as if the service lasted an hour, even if the CSW had only engaged with a consumer for a few minutes or had only received a text message from a consumer.

34.    In furtherance of the scheme, OMOMOWO and CO-CONSPIRATOR 1 instructed the CSW CO-CONSPIRATORS to utilize all 600 units for a consumer—the total amount of units authorized by Medicaid for a consumer during a 180-day period—without regard to medical necessity. For example, CO-CONSPIRATOR 1 and the CSW CO-CONSPIRATORS regularly submitted hour-long telehealth encounters for 10, 12, or 14 hours per day for multiple weeks in a row, and submitted false "back notes" to use up leftover units right before the 180-day period expired. OMOMOWO and CO-CONSPIRATOR 1 knowingly approved these false encounter notes and submitted them to Medicaid for reimbursement.

35.    Acting under the direction of and with the approval of OMOMOWO and CO-CONSPIRATOR 1, the CSW CO-CONSPIRATORS also submitted encounter notes for activities that were not authorized to be reimbursed by Medicaid. For example, OMOMOWO and CO-CONSPIRATOR 1 trained the CSW CO-CONSPIRATORS to bill for "collateral services," which included time spent waiting for consumers, driving to meet with consumers, picking up prescriptions for consumers, and coordinating food deliveries for consumers. OMOMOWO and CO-CONSPIRATOR 1 trained the CSW CO-CONSPIRATORS to falsify clinical encounter notes to disguise the actual conduct taking place, often by using the phrase "coping skills" to falsely indicate to DBH that the CSW CO-CONSPIRATORS were conducting services on behalf of consumers.

12

36.     Additionally, OMOMOWO and CO-CONSPIRATOR 1 directed the CSW CO-CONSPIRATORS to submit encounter notes for services that never occurred. OMOMOWO and CO-CONSPIRATOR 1 coached the CSW CO-CONSPIRATORS on ways to write encounter notes, including by inputting false and fraudulent information about an encounter, so as to avoid scrutiny by DBH. OMOMOWO and CO-CONSPIRATOR 1 likewise encouraged the CSW CO-CONSPIRATORS' use of template or "cut and paste" notes.

37.     OMOMOWO and CO-CONSPIRATOR 1 approved for submission for reimbursement multiple instances of fraudulent encounter notes submitted by the CSW CO-CONSPIRATORS under their supervision, including false encounter notes that reported the provision of MHRS to consumers who were actually deceased and consumers who had not been seen by their CSW in months.

38.     Finally, OMOMOWO and CO-CONSPIRATOR 1 directed the CSW CO-CONSPIRATORS to submit false and fraudulent CSW encounter notes regarding MHRS authorizations and reauthorizations. With respect to authorizations, OMOMOWO and CO-CONSPIRATOR 1 trained the CSW CO-CONSPIRATORS to submit two notes based on the same encounter and to submit the second, fraudulent note days after the encounter actually occurred.

39.     Despite knowing that Medicaid required that encounter notes contain truthful and accurate information about services provided and the amount of time spent conducting a service, OMOMOWO, CO-CONSPIRATOR 1, and the CSW CO-CONSPIRATORS knowingly and intentionally submitted such fraudulent encounter notes to Medicaid for reimbursement.

### Use of Proceeds of the Scheme

40.     On May 4, 2021, OMOMOWO opened a Wells Fargo business checking account ending in -4688 (the "Wells Fargo -4688 Account") in the name of "The Marcaulay Group, Inc."

OMOMOWO was the only signatory on the Wells Fargo -4688 Account. Between May 4, 2021 and October 19, 2022, the date that the Wells Fargo -4688 Account was closed, at least 96% of the total $10,101,628 that flowed into the Wells Fargo -4688 Account were the result of payments from AFFORDABLE and GOSHEN that were funded by proceeds from Medicaid reimbursements and derived from the above conspiracy and scheme. The remaining 4% of funds into the Wells Fargo -4688 Account were mostly comprised of related party transfers between THE MARCAULAY GROUP and/or OMOMOWO. OMOMOWO and THE MARCAULAY GROUP used the proceeds in the Wells Fargo -4688 Account to fund the following: four payments totaling $588,818 payable towards Casa Murano condominium unit #2N, a luxury condominium; 10 payments totaling $72,500 payable towards a 2022 Mercedes Benz GLS 450 4MATIC SUV; and one payment of $404,490 payable towards CasaMar condominium unit #1801, a luxury condominium.

41.    On September 21, 2022, OMOMOWO opened a Bank of America business checking account ending in -7294 (the "BOA -7294 Account") in the name of "The Marcaulay Group, Inc." OMOMOWO was the only signatory on the BOA -7294 Account. Between September 21, 2022 and January 6, 2023, the date that the BOA -7294 Account was closed, nearly 91% of the total $3,835,053 that flowed into the BOA -7294 Account were the result of payments from AFFORDABLE and GOSHEN that were funded by proceeds from Medicaid reimbursements and derived from the above conspiracy and scheme. The remaining 9% of funds into the BOA -7294 Account were mostly comprised of a single transfer from Lawonne Proctor, the CEO of AFFORDABLE. OMOMOWO and THE MARCAULAY GROUP used the funds in the BOA -7294 Account to fund one payment of $470,000 payable towards Casa Murano condominium unit #2N; and two payments totaling $94,719 payable to MarineMax, Inc., a luxury boat retailer.

42.    On December 14, 2022, OMOMOWO opened a JP Morgan Chase business checking account ending in -1253 (the "Chase -1253 Account") in the name of "The Marcaulay Group, Inc." OMOMOWO was the only signatory on the Chase -1253 Account. Between December 14, 2022 and May 31, 2023, at least 81% of the total $3,264,401 that flowed into the Chase -1253 Account were the result of payments from GOSHEN funded by proceeds from Medicaid reimbursements and derived from the above conspiracy and scheme. The remaining 19% of funds that flowed into the Chase -1253 Account were mostly comprised of related party transfers between THE MARCAULAY GROUP and/or OMOMOWO. OMOMOWO and THE MARCAULAY GROUP used those proceeds in the Chase -1253 Account to fund: at least six payments totaling $12,861 payable towards a 2022 Mercedes Benz GLS 450 4MATIC SUV and at least two payments totaling $46,500 payable towards a 2023 Mercedes-Benz S-Class S500 4MATIC 4-Door Sedan.

## COUNT ONE
### (Conspiracy – 18 U.S.C. § 1349)

43.    The allegations in paragraphs 1 through 42 of this Indictment are realleged and incorporated herein.

44.    Beginning at least as early as January 2020 and continuing through at least March 2023, in the District of Columbia and elsewhere, the defendants,

**OMOLERE OMOMOWO,**
**ZILAH BESSEM,**
**GREGORY CLARK,**
**ERNEST IKOMI,**
**DIANE MOCHE, and**
**SERAPHINE NWUFOR,**

did knowingly and willfully, that is, with the intent to further the objects of the conspiracy, combine, conspire, confederate, and agree with each other and others, known and unknown to the Grand Jury, to execute a scheme and artifice to defraud a health care benefit program affecting

commerce, as defined in Title 18, United States Code, Section 24(b), that is, D.C. Medicaid, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347 (Health Care Fraud).

### Object of the Conspiracy

45.     The object of the conspiracy was for the defendants, and their co-conspirators, to unlawfully enrich themselves by submitting false and fraudulent claims to D.C. Medicaid.

### Manner and Means of the Conspiracy

46.     The manner and means by which the defendants and their co-conspirators sought to accomplish the goal of the conspiracy included, among others, the following:

    a.  Recruiting Medicaid beneficiaries in the District of Columbia to use their information in the submission of false billings to Medicaid;

    b.  Submitted and causing to be submitted falsified LOCUS scores to Medicaid to certify consumers being stepped up into the ACT Program despite knowing that the consumers' medical needs did not justify being placed into the ACT Program;

    c.  Submitting and causing to be submitted falsified medical assessments to Medicaid to certify consumers being stepped down from the ACT Program despite knowing the medical assessments were not based on medical necessity and were instead designed to justify transferring the consumers out of PRESTIGE and to AFFORDABLE;

    d.  Submitting and causing to be submitted for reimbursement falsified clinical encounter notes for the provision of MHRS, including for ACT services, that were

(i) medically unnecessary; (ii) ineligible for Medicaid reimbursement; and (iii) not provided as represented;

e. Submitting and causing to be submitted clinical encounter notes that falsely and grossly inflated the amount of time spent conducting services;

f. Submitting and causing to be submitted bills to Medicaid for services that were not authorized for reimbursement; and

g. Submitting and causing to be submitted clinical encounter notes that contained false information in order to conceal the true nature of encounters and to avoid receiving scrutiny from DBH.

**(All in violation of Title 18, United States Code, Section 1349)**

## COUNTS TWO TO ELEVEN
### (Health Care Fraud – 18 U.S.C. § 1347)

47.     The allegations in paragraphs 1 through 42 of this Indictment are realleged and incorporated herein.

48.     On or about the dates listed below, in the District of Columbia and elsewhere, the defendants,

**OMOLERE OMOMOWO,
ZILAH BESSEM,
GREGORY CLARK,
ERNEST IKOMI,
DIANE MOCHE, and
SERAPHINE NWUFOR,**

aiding and abetting each other, and others, known and unknown to the Grand Jury, did knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the control of, the D.C. Medicaid program, a health care benefit program, as defined in 18  U.S.C. § 24(b), in connection with the delivery of and payment for

health care benefits, items, and services, namely Mental Health Rehabilitative Services ("MHRS") and Assertive Community Treatment ("ACT") services.

## Purpose of the Scheme

49.    It was a purpose of the scheme for defendants OMOMOLERE OMOMOWO, ZILAH BESSEM, GREGORY CLARK, ERNEST IKOMI, DIANE MOCHE, and SEREPHINE NWUFOR, and others, to unlawfully enrich themselves by, among other things, submitting and causing to be submitted, false and fraudulent claims for payment to D.C. Medicaid for MHRS that were not provided as claimed.

## Acts in Execution of the Scheme and Artifice

50.    On or about the dates specified below, in the District of Columbia and elsewhere, the defendants OMOMOLERE OMOMOWO, ZILAH BESSEM, GREGORY CLARK, ERNEST IKOMI, DIANE MOCHE, and SEREPHINE NWUFOR, in connection with the delivery of, and payment for, health care benefits, items, and services, aided and abetted by and aiding and abetting others known and unknown to the Grand Jury, did knowingly and willfully execute, and attempt to execute, the above-described scheme and artifice to defraud D.C. Medicaid, a federal health care program affecting commerce, as defined in Title 18, United States Code, Section 24(b), and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, any money or property owned by or under the custody of control of, said health care benefit program, by submitting or causing to be submitted the following false and fraudulent claims for reimbursement to D.C. Medicaid, all of which are not supported by the relevant call logs, cellphone location data, and consumer interviews:

| Count | Beneficiary/Medicaid ID | Date Range | Defendants | Units Billed |
|-------|-------------------------|------------|------------|--------------|
| 2 | M.T. (-9583) | 1-20-22 to 1-27-22 | OMOMOWO, BESSEM | 24 |
| 3 | P.K. (-7331) | 2-7-22 to 2-17-22 | OMOMOWO, BESSEM | 25 |
| 4 | D.H. (-5024) | 2-15-22 to 2-25-22 | OMOMOWO, CLARK | 15 |
| 5 | N.M. (-1401) | 2-11-22 to 3-7-22 | OMOMOWO, CLARK | 26 |
| 6 | G.G. (-9957) | 1-29-22 to 3-21-22 | OMOMOWO, IKOMI | 25 |
| 7 | J.L. (-6772) | 3-12-22 to 3-25-22 | OMOMOWO, IKOMI | 20 |
| 8 | M.G. (-2332) | 1-29-22 to 4-19-22 | OMOMOWO, MOCHE | 20 |
| 9 | M.T. (-9583) | 1-30-22 to 4-26-22 | OMOMOWO, MOCHE | 20 |
| 10 | M.G. (-2332) | 3-5-22 to 3-14-22 | OMOMOWO, NWUFOR | 18 |
| 11 | C.J. (-8239) | 3-6-22 to 3-11-22 | OMOMOWO, NWUFOR | 18 |

**(All in violation of Title 18, United States Code, Section 1347)**

## COUNTS TWELVE TO FIFTEEN
**(Engaging in Monetary Transactions in Property
Derived from Specified Unlawful Activity– 18 U.S.C. § 1957)**

51.    The allegations in paragraphs 1 through 42 of this Indictment are realleged and incorporated herein.

52.    On or about the dates and in the amounts set forth in the below table, in the District of Columbia and elsewhere, the defendant,

**OMOLERE OMOMOWO,**

having participated in the transfer of the proceeds of specified unlawful activity, namely, Conspiracy to Commit Health Care Fraud, in violation of 18 U.S.C. § 1349, and Health Care Fraud, in violation of 18 U.S.C. § 1347, did knowingly engage and attempt to engage in a monetary transaction affecting interstate commerce, in criminally derived property of a value greater than $10,000, and which in fact was derived from specified unlawful activity:

| Count | On or About Date | Amount | Transaction |
|-------|-----------------|--------|-------------|
| 12 | October 27, 2022 | $470,000 | Wire from Bank of America -7294 Account Payable to Old Republic Title toward Purchase of Casa Murano Condominiums (Unit 2N) |
| 13 | April 20, 2022 | $404,490 | Check Drawn from Wells Fargo -4688 Account Payable to Chicago Title Insurance Company Toward Purchase of CasaMar Condominiums (Unit 1801) |
| 14 | June 25, 2022 | $50,000 | Debit Card Transaction from Wells Fargo -4688 Account Payable to Mercedes Benz Fort Lauderdale (2022 GLS 450) |
| 15 | April 19, 2023 | $44,000 | Debit Card Transaction from Chase -1253 Account Payable to Mercedes Benz Fort Lauderdale (2023 S-Class S500) |

**(All in violation of Title 18, United States Code, Section 1957)**

## FORFEITURE ALLEGATIONS

### FORFEITURE ALLEGATION AS TO COUNTS ONE TO ELEVEN

The allegations contained in Counts ONE through ELEVEN of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Sections 982(a)(7).

Pursuant to Title 18, United States Code, Section 982(a)(7), upon conviction of an offense in violation of Title 18, United States Code, Section 1349, and United States Code, Section 1347, the defendants,

**OMOLERE OMOMOWO,**
**ZILAH BESSEM,**
**GREGORY CLARK,**
**ERNEST IKOMI,**
**DIANE MOCHE, and**
**SERAPHINE NWUFOR,**

shall forfeit to the United States of America any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense.

**FORFEITURE ALLEGATIONS AS TO COUNTS TWELVE TO FIFTEEN**

The allegations contained in Counts TWELVE through FIFTEEN of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Sections 982(a)(1).

Pursuant to Title 18, United States Code, Section 982(a)(1), upon conviction of an offense in violation of Title 18, United States Code, Section 1957, the defendant,

**OMOLERE OMOMOWO,**

shall forfeit to the United States of America any property, real or personal, involved in such offense, and any property traceable to such property.

**SPECIFIC PROPERTY SUBJECT TO FORFEITURE**

The property to be forfeited includes, but is not limited to, the following:

1. The real property, improvements, appurtenances located at 141 Isle of Venice Dr. #2-N, Fort Lauderdale, FL 33301, and any interest therein, legally described as:

   *Condominium Parcel No. 2 North of Casa Murano Condominium, according to the Declaration of Condominium thereof, recorded on March 15, 2024, as Instrument No. 119453451 of the Public Records of Broward County, Florida, as amended and/or supplemented from time to time, together with an undivided interest in the common elements appurtenant thereto;*

2. The real property, improvements, appurtenances, and any interest therein, located at 900 North Ocean, Unit 1801, Fort Lauderdale, FL 33062.

3. 2022 Mercedez Benz GLS 450 4MATIC SUV (VIN Number: JGFF5KE6NA633176)

4. 2023 Mercedez Benz S-Class S500 4MATIC 4-Door Sedan (VIN Number: W1K6G6DB1PA220844)

**MONEY JUDGMENT**

In the event of conviction, the United States may seek a money judgment.

## SUBSTITUTE ASSETS

If any of the property described above, as a result of any act or omission of the

defendant(s):

      a.     cannot be located upon the exercise of due diligence;

      b.     has been transferred or sold to, or deposited with, a third party;

      c.     has been placed beyond the jurisdiction of the court;

      d.     has been substantially diminished in value; or

      e.     has been commingled with other property which cannot be divided
              without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title

21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section

982(b)(1) and Title 28, United States Code, Section 2461(c).

A TRUE BILL:

FOREPERSON

_Matthew M. Graves /KLR_

MATTHEW M. GRAVES
UNITED STATES ATTORNEY IN AND FOR
THE DISTRICT OF COLUMBIA